UNITED STATES DISTRICT COURT                                          ECF
SOUTHERN DISTRICT OF NEW YORK
_____
                                              )
SECURITIES AND EXCHANGE COMMISSION,           )
                                              )
                        Plaintiff,            )        05 Civ. 7044 (RCC)
                                              )
              - against -                     )        MEMORANDUM
                                              )        & ORDER
THOMAS W. JONES and LEWIS E. DAIDONE,         )
                                              )
                        Defendants.           )
                                              )
_____

**RICHARD CONWAY CASEY, United States District Judge:**

Plaintiff Securities and Exchange Commission (the "Commission") commenced this action against defendants Thomas W. Jones and Lewis E. Daidone (together "Defendants") alleging aiding and abetting violations of the Investment Advisers Act of 1940 § 206 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2). Defendants now move for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motions are **GRANTED**.

## I.      BACKGROUND

Unless otherwise stated, the following facts are not in dispute.

This action arises from Defendants' employment with Citigroup Asset Management ("CAM"), a business unit of Citigroup, Inc., that provides investment adviser and management services to Citigroup-sponsored mutual funds (the "Funds"). Jones served as the chief executive officer of CAM from August 1997 until he resigned on October 20, 2004. While employed at CAM, Daidone served as its North American head of fund administration.

CAM's responsibilities vis-á-vis the Funds included recommending a transfer agent to the Funds' boards of directors. During the 1990s, First Data Investment Services Group ("First Data")

served as the Funds' transfer agent, providing transaction processing, shareholder accounting, customer service, and technology applications and operations.  With First Data's contract set to expire in 1999, however, CAM decided to review the transfer agent function and identify alternative options for the future.  Beginning in 1997, prior to Jones's arrival, CAM set out goals for its transfer agent initiative and retained Deloitte & Touche Consulting ("Deloitte") to assist its efforts.  CAM sought, by searching for transfer agent alternatives, to improve "the quality, delivery, product flexibility, and service innovation" of the transfer agent function and to generate income for CAM. (See Jones R. 56.1 Statement ¶ 5 (CAM sought to provide improved services and to "generate revenues" for the firm); Pl.'s R. 56.1 Statement ¶ 5 (CAM sought to provide improved services while maximizing profitability); Daidone R. 56.1 Statement ¶ 3 (same).)

Daidone was a member of the CAM team tasked with reviewing the transfer agent function; he had responsibility for the day-to-day financial management and fund accounting of the project. Christina Sydor, an attorney at CAM, was responsible for legal aspects of the project.  Both Daidone and Sydor also were officers of the Funds—Daidone was the Treasurer and Chief Financial Officer; Sydor was the Secretary—and both owed fiduciary duties to the Funds as a result.  (See Pl.'s Resp. to Jones R. 56.1 Statement ¶¶ 12, 14.)  After Jones joined CAM in August 1997, he assumed overall responsibility for the transfer agent initiative along with all other aspects of CAM's asset management business.  Though Jones kept himself apprised of the initiative, he did not spend a significant portion of his time on its details.  (See Jones Dep. 132:2-15, 134, 198:10-16, 274-75; Yellin Dep. 61:13-20, 324:14-325:8.)  According to his own testimony, Jones believed that CAM's staff was quite experienced, and he relied on them and Deloitte to properly execute the transfer agent project.  (Jones Dep. 34-36, 194-95, 322-24.)

The transfer agent project focused primarily on two questions: first, to what degree transfer agent functions should be brought in-house rather than outsourced; and second, supposing that only some transfer agent functions were brought in-house, which outside vendor should perform other necessary services.  After reviewing multiple options, Deloitte recommended that CAM create an affiliated transfer agent to assume customer service and transaction processing functions, and that it retain an outside vendor, DST, to handle the transfer agent technology.  (Ex. 6, at SEC 0071288; see also Ex. 5, at SEC 0014238.)[1]  Deloitte's recommendation did not provide for any further relationship between CAM and First Data.

In response to Deloitte's recommendation, First Data offered CAM discounts on its fees as a full-service transfer agent along with other incentives in the hope of salvaging the business relationship.  CAM did not bite.  On April 2, 1998, Daidone and others made a formal recommendation to Jones that CAM create an affiliated transfer agent unit and sub-contract with DST for technology.  The team's memo to Jones noted a conversion risk in switching to DST's technology platform, but deemed that risk minimal.  The memo also noted that selecting DST might jeopardize $8-10 million in revenues Citigroup (then known as Travelers) received annually from First Data for other business unrelated to the Funds.  But the memo concluded that the DST deal was "more attractive economically" than First Data's offer, and "on a going forward basis . . . provides the greatest potential for maximizing revenues."  (Ex. 10.)

Despite this recommendation, however, the deal with DST did not go forward.  According to the Commission, Sanford Weill, CEO of Citigroup (then Travelers), reviewed the memo and

---

[1] Unless otherwise stated, citations to exhibits refer to the parties' jointly submitted stipulated deposition exhibits.

asked Jones to continue negotiations with First Data, preferring to maintain the long-standing relationship if the "economics" were the same between First Data and DST.  (Pl.'s Opp. at 5.) According to Defendants, on the other hand, the proposed deal with DST failed to move ahead because it became impracticable after Travelers publicly announced its plans to merge with Citicorp on April 6, 1998.  Defendants claim that the merger "increased the incremental risk of also switching [transfer agent] technologies, given the simultaneous need to integrate the technology platforms of Travelers and Citicorp," and that any deal with DST became "indefensibly risky" as a result.  (Jones Mem. Summ. J. at 5; see also Daidone Mem. Summ. J. at 5.)

With DST on the sideline, Jones directed the CAM team to continue negotiations with First Data.  In early June, First Data offered further fee discounts to CAM but did not propose to divide transfer agent functions between them.  Deloitte reviewed the proposal and determined that it required First Data to remain the Funds' transfer agent, that First Data would receive all transfer agent fees paid by the Funds, and that First Data would subsequently provide "discounts" to CAM in the form of a "rebate."  (Ex. 12.)  Deloitte cautioned CAM against this arrangement, explaining that CAM "would have to assume responsibility for Customer Service and Transaction Processing to justify receiving [transfer agent] fees" and that First Data's proposed arrangement "would in no way be acceptable to the fund boards and may not be legally viable."  (Id.)

The negotiations between CAM and First Data continued through the summer of 1998 and concluded with an agreement in principle under which a CAM affiliate, Citigroup Trust Bank ("CTB"), would serve as the Funds' transfer agent and First Data as the sub-transfer agent; in effect, that CTB would take over customer service functions and would maintain overall responsibility for the transfer agent function while sub-contracting First Data to perform transaction processing and

4

all other customary functions of a transfer agent.  Though this arrangement required minimal investment by CTB—roughly $1 million to staff a customer service call center and $2.5 million in other expenses—it was expected to generate revenues for CTB of approximately $258 million over five years.  With sub-contracting fees to First Data projected at $17.3 million over the same time span, CAM expected CTB's profit as transfer agent to approach $240 million.  The CAM team concluded that the Funds would accept this arrangement because it improved services to the Funds and offered a significant reduction in the transfer agent fees paid by the Funds as fund assets grew. (Ex. 31; Ex. 248.)

During the negotiations, CAM and First Data also discussed other business relationships between the two companies, and First Data eventually offered a "revenue guarantee" for certain existing and unrelated business relationships between First Data and Citigroup.  The revenue guarantee was recorded in a side letter, which Sydor reviewed and edited along with the sub-transfer agent agreement.  Sydor never expressed any discomfort about the terms of the side letter to anyone at CAM.  On July 24, 1998, the CAM team presented Jones with a final recommendation memo that described the terms of both the sub-transfer agent agreement and the revenue guarantee.  Jones approved the recommendations.  Daidone signed both the sub-transfer agent agreement and the side letter later that year.

Ultimately, the transfer agent contract required approval from the Funds' boards.  Daidone played a prominent role in preparing the presentation to the boards, which included a formal memorandum (the "Board Memo") and a Power Point slide presentation (the "Board Power Point"). The parties dispute the extent to which others inside and outside of CAM, including Sydor and Deloitte, contributed to preparing the presentation.  (See Jones R. 56.1 Statement ¶ 40 ("Sydor,

Daidone, and Deloitte worked on preparing a board memorandum . . . to explain the proposal");

Daidone R. 56.1 Statement ¶ 12, 14 ("CAM, with the assistance of Deloitte . . . and with input from

outside counsel . . . set out to organize board materials," and Sydor was "coauthor of the Board

Memo, and reviewed the Board Power Point prior to presentation"); Pl.'s R. 56.1 Statement ¶ 39,

43 ("All of the themes and all of the business and financial content for the board presentations were

Daidone's ideas," and Sydor "had no substantive role with respect to the business or financial

matters disclosed to the boards").) Jones approved the Board Memo, though the parties dispute the

extent of his review.  (See Pl.'s Resp. to Jones R. 56.1 Statement ¶ 46.)

CAM presented the transfer agent proposal to the Funds' boards at regularly scheduled

meetings during the Spring and Summer of 1999.  Daidone presented the proposal at most of the

meetings.  Sydor attended at least three meetings, and she presented a similar transfer agent proposal

in at least one of them.  Jones did not attend any of the meetings.  (Id. ¶ 52.)

CAM provided the Board Memo to board members along with the sub-transfer agent contract

in advance of the board meetings.  The Board Memo included a section discussing CAM's review

of alternatives to First Data, stated that the transfer agent call center would be staffed initially with

15 employees, and stated that CAM anticipated a 33% profit margin as a result of the transfer agent

proposal.  The Commission contends that this projected profit margin was misleading, and that

"CAM's actual profit margin was projected to be at least 70%, and [would] balloon to greater than

90%."  (Pl.'s Opp. at 10.)

At the meetings, board members also were shown the Board Power Point.  The parties

dispute whether the Board Power Point as shown to the Funds' boards included a pro forma income

statement disclosing fees CTB expected to retain and fees it would pay to First Data, projecting a

6

profit to CTB of approximately $150 million over five years.[2]  (Daidone Mem. Summ. J. at 8; Pl.'s

Opp. at 10 n.8.)  Neither the Board Memo nor the Board Power Point disclosed the revenue

guarantee that was memorialized in the side letter.

Following a period of questions and discussion, each Board unanimously approved the

transfer agent proposal.  By the end of 1999, CAM completed the transfer agent initiative and

implemented it.  Approximately four years later, in August 2003, a former Citigroup employee,

Irving David, informed the Commission that the transfer agent arrangement was "probably not in the

best interest of the shareholders of the funds because there were profits that were being taken that

should have been passed on as savings to the shareholders of the funds as opposed to profits to the

corporation."  (Pl.'s Opp. at 22 (quoting David Dep. 50:21-51:4).)  On May 31, 2005, the

Commission entered an administrative order censuring Smith Barney Fund Management and

Citigroup Global Markets for CAM's activities.  The Commission ordered, among other things,

disgorgement of $109,004,551 plus prejudgment interest and a civil penalty of $80,000,000.  (May

31, 2005 Cease and Desist Order, at Jones Mem. Supp. Mot. to Dismiss Ex. A.)

On August 8, 2005, the Commission sued Defendants for aiding and abetting CAM in its

violation of § 206 of the Advisers Act, claiming that "the materials provided to the Funds'

boards—primarily prepared by Daidone and reviewed by Jones—did not disclose CAM's leveraging

the Funds' [transfer agent] business to obtain reciprocal business and revenue guarantees benefiting

only Citigroup."  (Pl.'s Opp. at 3.)  Defendants now move for summary judgment.

---

[2] The Board Power Point submitted by the parties as a stipulated deposition exhibit includes
the pro forma statement as the final slide.  (Ex. 46.)

## II.   DISCUSSION

The Commission states one cause of action against both defendants—aiding and abetting violations of § 206 of the Advisers Act—but seeks three forms of relief: civil penalties, a permanent injunction, and disgorgement.  None of these remedies is available.  The Commission's action for civil penalties and an injunction are time-barred, and its action for disgorgement is not supported by sufficient facts.  The Court will address the statute of limitations issues first, then turn to the Commission's substantive claim and an analysis of its disgorgement request.

### A.   Standard of Review

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Issues of fact are "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and "material" when the disputed facts "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When viewing the evidence, a court must assess the record in the light most favorable to the nonmovant, resolving all ambiguities and drawing all reasonable inferences in that party's favor. Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990).  In particular, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.

8

1994).

The party opposing summary judgment, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, summary judgment is appropriate when no rational trier of fact could find in favor of the nonmoving party because the evidence to support its case is so slight. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994).

**B.    Statute of Limitations**

The Advisers Act does not contain a limitations period. Therefore, to the extent the Commission's claims are subject to a statute of limitations, the catch-all limitations period in 28 U.S.C. § 2462 applies. SEC v. Jones, No. 05 Civ. 7044, 2006 WL 1084276, at *3 (S.D.N.Y. April 25, 2006). Section 2462 provides, in pertinent part, that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. The clear language of the statute is controlling, absent a clearly expressed legislative intention to the contrary. Consumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 108 (1980).

While § 2462 applies to SEC actions seeking civil penalties, some courts have found that Commission suits for equitable and remedial relief "are not governed by § 2462 because they are not actions or proceedings for a 'penalty' within the meaning of the statute." SEC v. Tandem Mgmt. Inc., No. 95 Civ. 8411, 2001 WL 1488218, at *6 (S.D.N.Y. Nov. 21, 2001) (citing cases). Most of these courts have determined that § 2462 does not apply to equitable relief that seeks to undo prior damage or protect the public from future harm. See, e.g., SEC v. Schiffer, No. 97 Civ. 5853, 1998 WL 226101, at *2 & n.6 (S.D.N.Y. May 5, 1998); SEC v. Lorin, 869 F. Supp. 1117 (S.D.N.Y. 1994).

In <u>Johnson v. SEC</u>, 87 F.3d 484, 486-92 (D.C. Cir. 1996), the D.C. Circuit Court of Appeals answered the question of whether § 2462 should apply to equitable relief that does not seek to undo damage or prevent future harm to the public.  It held that where equitable relief acts as a penalty—not a remedial measure—the five-year limitations period in § 2462 applies.  The court distinguished the remedies thus: a remedial measure restores the wronged party to its <u>status quo ante</u>, correcting or undoing the effects of a particular wrong, <u>id.</u> at 491, whereas a penalty is "a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's actions," <u>id.</u> at 488.  <u>See also</u> <u>United States v. Telluride</u>, 146 F.3d 1241, 1245-46 (10th Cir. 1998) (interpreting the term "penalty," for purposes of § 2462, "as a sanction or punishment imposed for violating a public law which goes beyond compensation for the injury caused by the defendant"); <u>SEC v. DiBella</u>, 409 F. Supp. 2d 122, 127-28 & n.3 (D. Conn. 2006) (noting that section 2462 applies to SEC claims for civil penalties, a permanent injunction, and an officer and director bar, but not to its claim for disgorgement).

<u>Johnson</u> further held that an equitable remedy, such as an injunction, which is primarily aimed at preventing future harm to the public, rather than at punishing a particular defendant, may be characterized as remedial though it is not directly tied to restoring the <u>status quo ante</u>.  <u>See</u> <u>Johnson</u>, 87 F.3d at 488 (explaining that a sanction "would less resemble punishment if the SEC had focused on . . . the degree of risk [defendant] posed to the public"); <u>id.</u> at 491 n.11 ("It is clearly possible for a sanction to be 'remedial' in the sense that its purpose is to protect the public, yet not be 'remedial' because it imposes a punishment going beyond the harm inflicted by the defendant."); <u>cf.</u> <u>SEC v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 99 (2d Cir. 1978) ("[A]n injunction, while not always a drastic remedy . . . , often is "much more than [a] mild prophylactic . . . . In some cases

10

the collateral consequences of an injunction can be very grave.").

In light of the relevant case law, the ordinary meaning of "penalty," and the clear language of § 2462, the Court holds that the limitations period in § 2462 applies to civil penalties and equitable relief that seeks to punish, but does not apply to equitable relief which seeks to remedy a past wrong or protect the public from future harm.  With this distinction in hand, the Court now turns to the statute of limitations issues before it.

### 1.    Civil Penalties

The SEC's claim for civil monetary penalties against Defendants is unquestionably a penalty and, as such, is subject to the five-year limitations period of § 2462.  The events underlying the Commission's claims in this case occurred in the early summer of 1999.  See Jones, 2006 WL 1084276, at *5.  The Commission filed this action in August 2005, six years after the alleged wrongdoing.  Having already determined that a "discovery of violation" rule does not apply to cases governed by § 2462—i.e., that the Commission's claim accrued when the factual and legal prerequisites for filing suit were in place, not when the Commission discovered those prerequisites—the Court must dismiss the claim for civil penalties as untimely unless the Commission demonstrates that it is entitled to tolling of the limitations period.  The Commission argues that tolling is warranted in this case pursuant to the fraudulent concealment doctrine.  Jones, 2006 WL 1084276, at *6; see also Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946) (requiring the fraudulent concealment doctrine to be "read into every federal statute"); In re Issuer Plaintiff IPO Antitrust Litig., No. 00 Civ. 7084, 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ("[T]he burden of establishing a fraudulent concealment reply to a defendant's statute of limitations defense rests squarely on the plaintiff.").

11

To toll the limitations period for fraudulent concealment, the Commission must demonstrate: (1) that Defendants concealed the existence of the cause of action; (2) that it did not discover the alleged wrongdoing until some point within five years of commencing this action; and (3) that its continuing ignorance was not attributable to lack of diligence on its part.  Id. (citing New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988)).  The Commission may prove the concealment element by demonstrating "either that [Defendants] took affirmative steps to prevent [discovery of the fraud] or that the wrong itself was of such a nature as to be self-concealing." Hendrickson Bros., 840 F.2d at 1083.  The Commission does not assert that Defendants took affirmative steps to conceal the alleged fraud; instead, it asserts that "the fraud alleged here was one of non-disclosure and was inherently self-concealing."  (Pl.'s Opp. at 21.)

Standing alone, allegations of fraud are generally insufficient to demonstrate that a particular act is self-concealing.  Indeed, for a fraud to be self-concealing, the defendant must have engaged in "some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that [was] designed to mask the cause of action."  Hobson v. Wilson, 737 F.2d 1, 34 (D.C. Cir. 1984) (citing Wood v. Carpenter, 101 U.S. (11 Otto) 135, 143 (1879) ("Concealment by mere silence is not enough.  There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.")).  As one court in this Circuit explained:

> The requirement that the fraud "conceal itself" must mean more than that the plaintiff is ignorant of the deception.  A better reading of the phrase is that it encompasses an enterprise where the particular fraud is, by its nature, unknowable.  A fraud "conceal(s) itself" when a plaintiff, even by the exercise of due diligence, could not uncover it. . . . [A] fraud conceals itself when the defendant does only what is necessary to perpetrate the fraud, and that alone makes the fraud unknowable . . . .

Long v. Abbott Mortgage Corp., 459 F. Supp. 108, 118, 120 (D. Conn. 1978) (Newman, J.)

(dismissing plaintiff's securities fraud claims as untimely because, inter alia, the allegedly fraudulent activity was not incapable of being known).

Here, the Commission has not met its burden to demonstrate that Defendants' alleged deception was unknowable and hence self-concealing. In the Court's opinion resolving Defendants' motion to dismiss pursuant to Rule 12(b)(6), the Court reviewed the Commission's allegations of fraud—that Defendants "did not disclose to the Funds' boards the benefits CAM would receive from the transfer agent arrangement or the revenue guarantee letter that allegedly motivated CAM to accept First Data's offer"—and held that, at the motion-to-dismiss stage, the non-disclosure would be treated as self-concealing. Jones, 2006 WL 1084276, at *6. Now, having enjoyed the benefit of full discovery, the Commission appears unable to offer anything more substantive; it simply rehashes the underlying allegations of fraud and labels them as self-concealing. (Pl.'s Opp. at 21.) Moreover, the Commission fails to cite a single securities case applying the self-concealing fraud doctrine to toll a statute of limitations. The Commission provides no argument and offers no facts that suggest Defendants' alleged misrepresentations or omissions were unknowable.

To the contrary, evidence in the record suggests that the alleged misrepresentations and omissions at issue were discoverable. The Commission claims to have learned of the alleged fraud in 2003 from a whistleblower, Irving David, who in sum and substance informed the Commission that CAM had engaged in an improper self-dealing transaction with the Funds. The Commission contends that it was this information which put it on notice of potential claims against Defendants. But this information was not concealed. The Board Memo describing the transfer agent proposal, which CAM delivered to the Funds' boards prior to its presentations, included the disclosure that a CAM affiliate, CTB, would enjoy a 33% profit margin from the new transfer agent arrangement.

13

Whether the 33% figure reflected the full extent of CTB's projected gains is largely immaterial to the question of notice (and the question of self-dealing vel non).  In the Commission's view, the transfer agent proposal established a structure whereby "profits . . . were being taken that should have been passed on as savings to the shareholders of the funds."  (Pl.'s Opp. at 22 (quoting David Dep. 50:21-51:4).)  The Board Memo also indicated the division of labor between CTB and First Data, stating that CTB's facility—a transfer agent call center—would be minimally staffed and would not entail significant start-up costs.  The Commission had access to much or all of this information through the Funds' prospectuses, registration statements, and the Commission's own investigatory authority.  See 15 U.S.C. §§ 80b-4, 80a-30(b) (providing the Commission with a right of access to documents and employees in a mutual fund complex); see also Wood, 101 U.S. (11 Otto) at 143 ("[T]he means of knowledge are the same thing in effect as knowledge itself.").

In short, Irving David drew the Commission's attention to things that were not concealed. The Commission's subsequent examination of CAM in 2003 revealed the revenue guarantee and other alleged frauds in short order.  (Am. Compl. ¶¶ 114-15.)  Thus, while Defendants' allegedly fraudulent acts of misrepresentation may not have been affirmatively disclosed to the Commission, the record does not support a finding that they were incapable of being known.  See Long, 459 F. Supp. at 120.  At this stage of the litigation, then, the Commission's conclusory assertion of a self-concealing fraud is insufficient to sustain its claim for civil penalties.

### 2.      Permanent Injunction

The Commission seeks a permanent injunction prohibiting Defendants from committing future violations of § 206 of the Advisers Act.  As the Court outlined above, whether the Commission's action for a permanent injunction is subject to the five-year limitations period in §

2462 depends on whether the injunction is a penalty or a remedial measure.  See, e.g., Johnson, 87 F.3d at 488-90.  To make this determination, the Court looks to the likelihood of recurrence of violations and the possible collateral consequences of issuing an injunction.

While case law in this area is sparse, the Second Circuit has offered guidance in its analysis of the availability of permanent injunctions pursuant to the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77, and the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78. See SEC v. Patel, 61 F.3d 137, 141-42 (2d Cir. 1995); Commonwealth, 574 F.2d at 99.  With respect to recurrence, the Second Circuit demands that the Commission "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence."  Commonwealth, 574 F.2d at 99; see also id. at 99 ("The Commission cannot obtain relief without positive proof of a reasonable likelihood that past wrong-doing will recur.") (citation and alterations omitted); SEC v. Culpepper, 270 F.2d 241, 250 (2d Cir. 1959) ("[T]he moving party must satisfy the court that relief is needed [and] that there exists some cognizable danger of recurrent violation. . . ."); Patel, 61 F.3d at 141 (finding general statement that defendant "used his position . . . to engage in misconduct . . . can in no way justify the prediction that future misconduct will occur").  In the present context, the absence of a similar showing would indicate that the requested injunction is not aimed at protecting the public from future harm, but more likely aimed at punishing Defendants.[3]  See Johnson, 87 F.3d at 488.  An injunction of the latter ilk is a penalty subject to the five-year limitations period in § 2462.

_____

[3] This inquiry would be unnecessary were the statute of limitations not an issue here, for though the Securities Act and the Exchange Act only "speak . . . of enjoining 'any person (who) is engaged or about to engage in any acts or practices' which constitute or will constitute a violation," Commonwealth, 574 F.2d at 99 (citing Securities Act § 20(b) and Exchange Act § 21(d)), the Advisers Act also permits injunctions to issue against any person who "has engaged" in a violation of the Advisors Act, 15 U.S.C. § 80b-9(d).

Here, the Commission has adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest "some cognizable danger of recurrent violation." <u>Culpepper</u>, 270 F.2d at 250. And the Commission's exclusive reliance on Defendants' past conduct is insufficient to demonstrate the need for a permanent injunction in this case. By way of comparison, the court in <u>Proffitt v. FDIC</u>, 200 F.3d 855 (D.C. Cir. 2000), held that the FDIC's action to remove a bank director and permanently bar him from the industry was time barred under § 2462. The court reasoned that the requested relief was punishment because it was "based solely on Proffitt's long past conduct and made no attempt to evaluate his present fitness or competence." <u>Id.</u> at 862; <u>see also</u> <u>Patel</u>, 61 F.3d at 141 (a general statement that defendant "used his position . . . to engage in misconduct . . . can in no way justify the prediction that future misconduct will occur").

In <u>SEC v. Posner</u>, 16 F.3d 520, 521-22 (2d Cir. 1994), on the other hand, the court upheld a permanent injunction prohibiting defendants from serving as officers or directors of any public company where the district court found a "high degree of scienter," past securities laws violations, and lack of assurances against future violations. In that case, however, the district court based its decision largely on the fact that the defendants were "repeat offenders" who previously had been enjoined from violating the securities laws. <u>SEC v. Drexel Burnham Lambert Inc.</u>, 837 F. Supp. 587, 611 (S.D.N.Y. 1993). Having thus identified a pattern of violations, the court predicted a likelihood of future misconduct as well. <u>Id.</u> Here, unlike in <u>Posner</u> and <u>Drexel Burnham</u>, the Commission has not put forth any facts that would indicate Defendants engaged in a pattern of securities laws violations.

The Court also notes that several years have passed since Defendants' alleged misconduct apparently without incident. This fact further undercuts the Commission's assertion that Defendants

pose a continuing risk to the public.  See Proffitt, 200 F.3d at 862 ("While a serious offense, even long past, may indicate [defendant's] current risk to the public, that offense cannot alone determine his fitness almost a decade later."); cf. In re Moskowitz, Exchange Act Release No. 45,609, 77 SEC Docket 446 (March 21, 2002) (explaining that after six years, "[t]he passage of time since Moskowitz's violative conduct militates against the issuance of a cease-and-desist order").

With respect to collateral consequences, the Second Circuit has explained that an injunction preventing future violations of the securities laws can be more punitive than remedial.  See Commonwealth, 574 F.2d at 99.  And as the court in Johnson explained, though "the test for whether a sanction is sufficiently punitive to constitute a 'penalty' within the meaning of § 2462 is an objective one, . . . the degree and extent of the consequences to the subject of the sanction must be considered as a relevant factor in determining whether the sanction is a penalty."  87 F.3d at 488.

Here, as in many securities cases, the potential collateral consequences of a permanent injunction are quite serious.  See, e.g., Johnson, 87 F.3d at 489; Commonwealth, 574 F.2d at 99; SEC v. Geon Indus., Inc., 531 F.2d 39, 55 (2d Cir. 1976).  The practical effect of such an injunction here would be to stigmatize Defendants in the investment community and significantly impair their ability to pursue a career.   In fact, a permanent injunction would provide authority for the Commission to seek to permanently bar Defendants from the investment advisor industry.  See, e.g., 15 U.S.C. § 80a-9(a)(2); § 80b-3(e)(3), (f).  Daidone, in particular, asserts that the Commission already has indicated its intention to seek such a bar.  (Daidone Mem. Supp. Mot. to Dismiss at 17.)  The severity of these collateral consequences indicate that the requested injunction would carry with it the sting of punishment.

In sum, the Commission has not offered facts that suggest the requested injunction is aimed

17

at protecting the public from future harm.  When viewed together with the severity of potential collateral consequences for Defendants should a permanent injunction issue in this case, the Commission's requested relief can only be characterized as a penalty.  Accordingly, the Commission's request for an injunction is subject to the five-year limitations period of § 2462 and must be dismissed as untimely.

### 3.      Disgorgement

In the Second Circuit, it is well established that the primary purpose of disgorgement is to deter future fraud by depriving violators of their ill-gotten gains.  <u>See, e.g.</u>, <u>SEC v. Cavanagh</u>, 445 F.3d 105 (2d Cir. 2006); <u>SEC v. Fischbach Corp.</u>, 133 F.3d 170 (2d Cir. 1997); <u>Patel</u>, 61 F.3d at 140-41; <u>SEC v. Tome</u>, 833 F.2d 1086 (2d Cir. 1987);  <u>Commonwealth</u>, 574 F.2d at 102-03.  Indeed, "[u]nlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched."  <u>Commonwealth</u>, 574 F.2d at 102.  The Second Circuit recently explained that because disgorgement is a remedy aimed at public protection rather than investor compensation, the remedy is decidedly remedial rather than punitive.  <u>Cavanagh</u>, 445 F.3d at 117 & n.25.  Accordingly, the Commission's action for disgorgement in this case is not subject to the five-year limitations period in § 2462.

### C.      Aiding and Abetting Liability and the Absence of Ill-Gotten Gains

The Commission's claims against Defendants for aiding and abetting securities fraud requires proof of three elements: "(1) the existence of a securities law violation by the primary party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  <u>Jones</u>, 2006 WL 1084276, at *7 (internal quotations and alterations omitted).  Even if the Court assumes, without deciding, that

18

genuine issues of material fact exist under each of these elements as to both Jones and Daidone, the Court finds that summary judgment is warranted in this case because the Commission's only remaining remedy—disgorgement—is unavailable.

District courts have broad equitable power to fashion appropriate remedies for violations of the securities laws.  First Jersey, 101 F.3d at 1474.  This discretion extends not only to the determination of whether or not to order disgorgement, but also to calculating the amount to be disgorged.  Id. at 1474-75.  The disgorgement remedy "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing—a process sometimes called 'accounting'—and an order compelling the wrongdoer to pay that amount plus interest to the court."  Cavanagh, 445 F.3d at 116.  Importantly, because disgorgement is remedial and not punitive, a court cannot order disgorgement above the amount wrongfully acquired.  See id. n.25; see also SEC v. AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004) ("[I]t is well settled that the amount of disgorgement . . . is determined by the amount of profit realized by the defendant.").  But a court need not determine the precise amount of funds a defendant acquired as a result of his misconduct.  "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation."  Patel, 61 F.3d at 139 (citation omitted).

Here, the Commission seeks to disgorge the amount of money by which Defendants were enriched as a result of their alleged misrepresentations and omissions relating to the transfer agent proposal.  To this end, however, the Commission is unable to set forth any evidence of specific profits subject to disgorgement.  In fact, the only evidence the Commission has offered in support of its disgorgement action against Daidone involves statements from Daidone's supervisors that his compensation was based on how he performed on significant projects, that the transfer agent

initiative was a large project, and that his compensation in 1999 might have been affected by the initiative. (Pl.'s Opp. at 23-24 (citing Yellin Dep. 413:3-18; Wallace Dep. 23:4-25:10).) The Commission offers even fewer facts in support of its disgorgement action against Jones, noting only Jones' own testimony that his boss was a "very performance-oriented person, and had a reputation that if you did a good job, he paid you well." (Pl.'s Opp. at 24 (quoting Jones Dep. 41:9-20).)

Thus, among the hundreds of pages submitted as exhibits to the parties' summary judgment papers, the Commission is unable to provide the Court with any guideposts for determining the proper amount of Defendants' compensation subject to disgorgement. Although the Court need only determine a reasonable approximation of Defendants' compensation causally connected to the alleged violations before ordering disgorgement, the Commission has provided no evidence which would allow the Court to do so. Accordingly, the Commission's disgorgement claims against Defendants must be dismissed.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** in its entirety.

**So Ordered**:   New York, New York
February 26, 2007

Richard Conway Casey

**Richard Conway Casey, U.S.D.J.**